[Criminal No. 957. Filed July 14, 1945.]

[161 Pac. (2d) 121.]

*JOEL GULDIN, Appellant, v. THE STATE OF ARIZONA, Appellee.

Mr. Geo. F. Senner, and Mr. Sam Lazovich, for Appellant.

Mr. John L. Sullivan, Attorney General, Mr. Earl Anderson, Assistant Attorney General, Mr. Frank E. Tippett, County Attorney, Mr. D. E. Rienhardt, Deputy County Attorney, for Appellee.

STANFORD, C. J.—This is a case of statutory rape alleged to have been committed by the stepfather on his stepdaughter who was eight years of age, the offense claimed to have been committed at the home of the parents in Globe, Arizona, on the 28th day of August, 1944. The jury brought in a

* See Subsequent Opinion, post, p. 411.

verdict of guilty at the trial in the superior court, and from the judgment rendered thereon, this appeal is taken.

We will hereafter style the appellant as the defendant and the State of Arizona as the state.

The defendant submits four assignments of error committed by the trial court, the first one being that the verdict is not justified, and is contrary to the evidence produced by the state at the trial. The defendant contends that when a conviction is based on the uncorroborated testimony of the prosecutrix, her evidence must be such as to show reasonable physical possibility that the alleged crime could have been committed. Supporting that he cites *Reidhead* v. *State,* 31 Ariz. 70, 250 Pac. 366. That is a case of where the prosecutrix was of age and resisted the commission of the offense. Defendant quotes from said case:

"And when a verdict of guilty is returned on the evidence of the prosecutrix alone, her story must be reasonable, consistent, and not inherently impossible or improbable to a degree that it would make it incredible to the ordinary man."

Defendant sets forth that it would be impossible for the offense to have been committed under the testimony given by the prosecutrix inasmuch as she stated that she was sitting on the lavatory, meaning the toilet seat, and that he was in a standing position when he committed the alleged offense, showing a physical impossibility that the offense could have been committed, since the lavatory seat was only eighteen inches from the bottom of the floor and the defendant was six feet tall.

Witness John Lundgren, for the defendant, testified on cross-examination:

"Q. What kind of a tank is that toilet furnished with, is it up on the wall—does the water come in from the top? A. From the top.

"Q. Is it a low down tank or one on the wall? A. On the wall.

"Q. Immediately behind the water bowl? A. Yes sir.

"Q. Did you measure the height of the top of that tank? A. No, I didn't.

"Q. How high up is that off the floor, approximately? A. Oh, I judge around, I don't know, probably three feet, I don't know.

"Q. Coming just about to your belt line? A. Probably would, yes."

The child in question in that respect testified as follows:

"Q. Now, your daddy had you in the lavatory? A. Yes.

"Q. What did he do? A. He put his person into me.

"Q. He did? A. Yes, man.

"Q. Where were you? A. He had me sit up on the top of the lavatory.

"Q. Was he standing up at that time? A. Yes, man, he was standing up.

"Q. Were you sitting down or standing up? A. Sitting down.

"Q. You know your daddy was standing up? A. Yes man.

"Q. You are not mistaken in that? A. No, man.

"Q. He took his person out? A. Yes, man.

"Q. What did he do in regard to your clothing at that time?

"The Court: Did he take off your clothing at that time? A. Yes, man.

"Mr. Senner: Did he take them all off? A. No, man.

"Q. What did he take off? A. Just my underwear.

"Q. Just your underwear? A. Yes, man.

"Q. You mean your panties or all your underwear? A. Just my panties.

"Q. Then your mother was there? A. Yes, man.

"Q. Did you holler, call your mother, I mean? A. Yes, man.

"Q. What did your mother say? A. She tried to get in but she couldn't, and she told my grandmother—I mean told my sister, to go and tell my grandmother.

"Q. Your sister went for her? A. Yes, man.

"Q. Did your grandmother come there? A. Yes, man.

"Q. Then what happened? A. My mother was telling him, she hollered at him and said my grandmother was coming and he went in there and started beating her around, went in the other room and started beating her around.

"Q. Your mother or grandmother? A. My mother.

"Q. What did he do to your mother? A. He just beat her is all.

"Q. Did he hit her or just slap her? A. No, he beat her with his fists.

"Q. Was that the time he knocked her out? A. No, man.

"Q. When was that? A. It was the first time, before we came there.

"Q. The Sunday before? A. Yes, man."

Frank E. Tippett, county attorney of Gila County, testified as follows relative to the statements made by Mary Elizabeth Guldin, the mother of the defendant herein:

"Q. You know the witness, Mary E. Guldin, who testified on the witness stand here this morning, the lady who sits here? A. I do.

"Q. Did you see her that evening? A. I did.

"Q. Did you, together with Mr. Shute, have a conversation with her? A. I did.

"Q. Were you present at the time the Justice of the Peace had sent the officers to bring her down? A. I wasn't.

"Q. You heard her here this morning on the stand? A. I did.

"Q. And her qualifications of the conversation that took place there? A. I did.

"Q. Did she make any such qualifications of the conversation? A. There were no qualifications made.

"Q. At no time did she say 'if'? A. No.

"Q. 'If he were guilty' or 'if he were in Virginia'? A. She did not.

"Q. Did you ever hear such statements made by her? A. No.

"Q. Will you please repeat the conversation? As near as you can, between you and Mr. Shute and Mrs. Guldin? A. When I arrived at the office Mr. Shute and Mrs. Guldin were there. He had told me over the phone about the type of case it was, so I ascertained the relationship of Mrs. Guldin and the accused, Guldin, and questioned her about what she knew about the case. She said he was her son, Joel Guldin, and she says, 'He is the one, even though he is my son. I made an examination myself of the little girl. She is now in the doctor's office being examined, but I already made an examination and from my examination and my conversation with her, there is no doubt in my mind but what my son committed the act.' . . . ."

The case of *State* v. *Pollock*, 57 Ariz. 415, 114 Pac. (2d) 249, 250, states that in statutory rape prosecution may be had upon the uncorroborated testimony of the prosecutrix. We quote:

"The first question is as to the sufficiency of the evidence to sustain the verdict. The prosecutrix testified directly and positively to the completed crime. Defendant denied that he had either attempted or completed the offense charged. If this were all, the question would undoubtedly be one for the jury, for in Arizona in a case of this kind a conviction may be had upon the uncorroborated testimony of the prosecutrix unless her story is physically impossible, or so incredible that no reasonable man could believe it. *Reidhead* v. *State*, 31 Ariz. 70, 250 Pac. 366; *Zavala* v. *State*, 39 Ariz. 123, 4 Pac. (2d) 390."

The case of *People* v. *King*, 56 Cal. App. 484, 205 Pac. 703, 704, is where the offense was committed against the stepdaughter of accused, and where the girl was fifteen years of age. The court in that case said:

"The further points urged, that the girl's story is improbable and that it required corroboration, are without merit. . . .

"It was not necessary for the story of the prosecutrix to be corroborated. . . . "

Again in reference to the uncorroborated testimony of the prosecutrix under the age of consent, we quote from annotations following the case of *Noonan* v. *State,* 117 Neb. 520, 221 N. W. 434, 60 A. L. R. 1118:

"The uncorroborated testimony of an infant prosecutrix is sufficient to justify a conviction for rape. . . . "

Defendant's second assignment of error is:

"That the substantial rights of the defendant were prejudiced by the misconduct of the County Attorney in commenting on the failure of defendant's wife to testify."

This assignment is based on Section 44–2702, Arizona Code Annotated 1939, which reads, in part, as follows:

"1. A husband can not be examined for or against his wife, without her consent, nor a wife for or against her husband, without his consent; nor can either, during the marriage or afterwards, be, without the consent of the other, examined as to any communication made by one to the other during the marriage; but this exception does not apply in a criminal action or proceeding for a crime committed by the husband against the wife, or by the wife against the husband nor in a criminal action or proceeding against the husband for the abandonment, failure to support or provide for, or failure or neglect to furnish the necessities of life to the wife or the minor children, and either may, at his or her own request, but not otherwise, be examined as a witness for or against the other in a prosecution for bigamy or adultery, committed by either husband or wife, or for rape, seduction, or the crime against nature, or any similar offense, committed by the husband."

In our case of *Zumwalt* v. *State,* 16 Ariz. 82, 141 Pac. 710, 712, a case of this nature where the prosecuting witness was under the age of consent, this court did not say what a county attorney could or could not say about the wife not taking the witness stand, the language of the county attorney not being in the record. On that subject we merely said:

" . . . He not having the right to call her as a witness, that being entirely at her option, it would seem that the county attorney ought not to make adverse comment on her refusal to testify, for it is within her power to refuse, however anxious he might be to use her as a witness. The defendant has failed to preserve in the record what was said by the county attorney, and we have no means of determining whether his comment was prejudicial to defendant's rights or not."

In this case, not from the transcript of evidence, but from the motion for new trial, we find that the words of the county attorney complained of were:

" 'If the defense wanted to bring out a motive of the defendant's wife in bringing this charge against the defendant, why did the defense not produce her here to prove the motive of the charge?' "

The above quotation would indicate, and counsel in their arguments admitted the fact, that counsel for defense had, prior to that time in argument before the jury, made a statement to the effect that the wife signed the complaint against defendant because she was jealous.

We hold that the comment of the county attorney in the instant case was not reversible error.

Defendant's third assignment of error is that the county attorney made the following prejudicial remark in his argument before the jury: "This defend- is a sex-mad maniac."

In the case of *Hash* v. *State,* 48 Ariz. 43, 59 Pac. (2d) 305, 309, the county attorney, in his argument, made the following statement:

" . . . He is worse than a thief in the night and should be treated accordingly. . . . "

Our court said in respect to that language:

"The evidence supported this statement so far as it attempted to recite the facts. It is seen that the phrase criticized is the deduction of the speaker from the facts as related, wherein he likens one who steals or takes a young girl's virtue unto one who steals property at night. He was using a mere figure of speech to stress and emphasize the enormity of the offense as he viewed it. He was only calling to the attention of the jury in a rather rugged manner what every right-thinking person believes. The characterization of defendant's acts, as that 'he is worse than a thief in the night and should be treated accordingly,' we think was justified and permissible and the court did not err in refusing to strike the remarks on defendant's motion. . . . "

As set forth in the case of *Taylor* v. *State of Arizona,* 55 Ariz. 29, 97 Pac. (2d) 927, 932, this court has said that words similar to the ones above quoted were not improper under the evidence:

"It is contended further that the county attorney was guilty of gross misconduct in his closing argument in this: he approached appellant sitting at the table and threatened as if to administer to him corporal punishment and applied to him at different stages of the address language wholly uncalled for by the evidence and extremely prejudicial. He referred to him as a 'sex crazed man' and to his act as that 'of a warped mind, a sex crazed mind.' A reading of the entire argument discloses that the county attorney did make a rather impassioned appeal for the conviction of appellant, but neither in the language quoted nor the remainder of the address did he go further in this respect than the State's evidence warranted. If true, and the jury believed it, the language applied to appellant was a perfectly normal inference to be drawn from it."

We believe that the evidence in the instant case supports the statement of the county attorney

that the defendant was a "sex maniac" because the testimony shows that on various occasions he did commit the same offense with this child. We see no reversible error in that argument to the jury.

■ The last matter complained of is that during argument the county attorney interrupted one of the attorneys for the defense, complaining that he was not keeping within the facts in the record. The court thereupon admonished the defense attorney to stay within the record. Whether he was, or was not, within the record, we feel that no harm could be done before the jury by such an admonition unless it be shown that the court gave the instruction in a manner unbecoming to the dignity of a judge of the trial court.

This case was tried to a jury of citizens of Gila County. A verdict of guilty was returned against the defendant. Thereafter the trial court, the Honorable C. C. Faires, one of the leading and most experienced trial judges in our state, passed on the motion for new trial, which contained the same matters set forth in the assignments of error herein determined.

We find that the defendant had a fair and impartial trial and that his rights were well preserved by his counsel and that no prejudicial error was committed in the trial of the action.

The judgment is accordingly affirmed.

MORGAN, J., concurs.

LaPRADE, J. (Dissenting).—I cannot concur in the result or the reasoning contained in the majority opinion. The defendant in this case was convicted of a heinous offense, and sentenced to serve not less than thirty nor more than fifty years in the Arizona State Prison; this upon the uncorroborated testimony of an ignorant, frightened child of eight years. This child was permitted to testify to previous offenses of a like nature alleged to have been committed by the

defendant upon her. The child did not know her own age, month of birth, or date (R. T., p. 12). In response to the following question, she made this answer:

"Q. Do you know how old you are? A. Seven, I think."

The child testified that the defendant had repeatedly, almost daily, had sexual intercourse with her since she was three years of age. What little testimony was elicited from the prosecuting witness was accomplished by leading questions, this over objection, and upon the court's announcing that it would permit the county attorney to ask leading questions. The leading character of the questions is evidenced by the following sample taken from the Reporter's Transcript. In effect, the interrogator did the testifying. After having testified that she did not know the month or date of her birth, she would answer all leading questions, "Yes, man."

"Q. You had a birthday on the 24th of last August? A. Yes, man.

"Q. You were eight years old then? A. Yes, sir. . . .

"Q. Do you know Joe Guldin? A. Yes, man.

"Q. Do you see him in the Court Room? A. Yes, right there.

"Q. Sitting in back here? A. Yes, man.

"Q. He is your stepfather, isn't he? A. Yes, man.

"Q. Married to your mother? A. Yes, man.

"Q. Did he ever bother or molest you in any way? A. Yes, man.

"Q. Did he ever have sexual intercourse with you, Joan? A. Yes, man. . . .

"Q. Did he ever take your panties off? A. Yes, man.

"Q. Did he get his person into your person? A. Yes, man.

"Q. Did he make you bleed? A. Yes, man.

"Q. Did it hurt you? A. Yes, man."

The foregoing testimony was given with reference to an incident other than the one for which the defendant was on trial. She was interrogated by the county attorney as follows, with reference to another and additional occasion than the one for which the defendant was on trial:

"Q. Did he take your little clothes off that night? A. Yes, man. . . .

"Q. Did he put his person into your person? A. Yes."

The only testimony produced on direct examination by this child relative to defendant's guilt in the instant case appears as follows: After having testified as to previous occurrences, this question was asked by the county attorney:

"Q. The last time this happened was when he had you in the lavatory, the toilet, at your home? A. Yes, man."

One question that was not leading and that could not be answered by "Yes, man," was accidently put. The question propounded was this:

"Q. What did he do in regard to your clothing at that time?"

The court interrupted before she could answer, and asked this leading question:

"Q. Did he take your clothing off at that time?" To which she answered: "A. Yes, man."

Under our statute, Section 23–103, Arizona Code Annotated 1939, "Children under ten (10) years of age, who appear incapable of receiving just impressions of the facts respecting which they are examined, or of relating them truly" are incompetent to testify. It is thus seen that intelligence and not age is the proper test by which the competency of an infant witness should be determined. *Sheek* v. *State,* 19 Ariz. 509, 172 Pac. 662; *Keefe* v. *State,* 50 Ariz. 293, 72 Pac. (2d) 425. The question of competency rests largely

in the sound discretion of the trial court. (Cases above cited.) In view of the leading character of the questions propounded, little opportunity was given to discover the intelligence of the prosecuting witness or her ability to *relate the facts truly*. I am of the opinion that in view of the gravity of the offense charged at least an attempt should have been made to have the child relate without prompting and leading what had occurred, if she could.

The majority opinion vaults the statute, Section 44–2702, Arizona Code Annotated 1939, and the holding in the case of *Zumwalt* v. *State,* 16 Ariz. 82, 141 Pac. 710, by leaving the innuendo that the transcript does not disclose that the county attorney commented upon the fact that the wife of the defendant was not called by him. The transcript of the evidence shows that the following took place during the argument of the county attorney. Objection by counsel for defendant: "Your honor, we object to the remarks of the County Attorney about the defendant's wife and stating why we didn't bring her here. . . . " The brief of the state, which was in fact prepared by the county attorney who tried the case, admits that he commented upon the fact that the defendant did not call his wife to testify in his behalf. The statement in the brief is as follows:

" . . . The comment of the County Attorney anent the failure of defendant to produce his wife as a witness was entirely proper. See Zumwalt v. State."

The holding in the Zumwalt case is absolutely to the contrary. The county attorney at the time of the oral argument in this court admitted that the wife had told him that she would not testify for the state. Nevertheless, the following proceedings were had. At the beginning of the trial the court asked the county attorney to call his witnesses. Among these witnesses the county attorney announced the name Velma Gul-

din, the wife of the defendant, pointed her out, and announced that she was then and there present (she was at that moment an escapee from the Arizona State Hospital for the Insane).; whereupon the court in the presence of the jury made the following statement: *"Let the record show the wife is being held as a material witness by the state. She will be called in turn."* Under the provisions of the statute and the decision of this court in the Zumwalt case, the wife could have been examined as a witness *only* at her own request. She could not be compelled to be a witness and the state had no right or authority to detain her as a material witness, and even had she been lawfully detained as a material witness, it was prejudicial error on the part of the trial court to announce that she was being detained by the state.

The situation now adds up to this: The county attorney announces that the wife of the defendant will be a witness for the state; the court announces that she is being held as a material witness for the state and *will be called;* the wife advises the county attorney that she will not testify; the county attorney then censors the defendant for not calling his wife as a witness, which the defendant was powerless to do. He was helpless to defend against this argument. The attempted excuse for this conduct is set forth in the state's brief as follows:

"We wish to point out that defendant's counsel in argument told the jury that the defendant's wife, Velma Guldin, had made the complaint against defendant because of her jealousy, and we naturally in our argument in reply to defense argument pointed out that if such were true, defendant had the right to produce his wife as his witness, she being readily available, . . . "

The defendant testified that at the time of the alleged offense he was suffering from gonorrhea and had been treated by a doctor. The state had not

offered any evidence to the effect that the child in question was infected with gonorrhea. The defendant undoubtedly intended that the jury would conclude that if he was suffering from gonorrhea the girl would have been infected, and the state not having offered any proof that she was infected, the inference would be that he had not had sexual intercourse with her. The defendant, to corroborate his statement of infection, called the doctor who had treated him. The doctor gave his name, identified the defendant, and said that he had treated him, but could not recall the dates of the treatment, whereupon the following questions were asked and answers given:

"Q. To the best of your recollection, Doctor, when was that, about? A. Well, I can give you the exact circumstances of the first time I saw him, if you would like me to.

"Q. All right. A. Judge Faires called me and asked me if there was something couldn't be done to stop this fellow from hollering so much. I went over to the jail to examine him and he was up there kind of a like a crazy man, except that a person of ordinary perspective could see it was absolutely put on. There was no sign of insanity whatever. What he was doing was just a case of putting on and I told the Sheriff to that effect, and advised him to make him shut up.

"Q. And then? A. Later on I was called under similar circumstances by the Sheriff. I went up and examined him again, and he was carrying on this crazy stuff again. I advised the Sheriff to get a piece of lead pipe and crack him over the head with it. It was absolutely put on and nothing else. I was called a third time. He said he was sick and—do you want me to tell you about that too?"

After the foregoing unsolicited and not responsive answers were given, the doctor gave the following contradictory testimony—that the defendant was suffering from a urinary discharge that "was probably a recurring gonorrheal infection and uretheritis, or

possible gonorrheal infection or simply uretheritis" but "not necessarily a venereal disease."

The defendant stood on his defense of not guilty. He at no time attempted to excuse his acts on the ground of insanity. Nevertheless, the doctor was permitted voluntarily to make a speech to the jury regarding what the doctor considered to be actions of feigned insanity. He concluded his evidence by stating that he advised the "Sheriff to get a piece of lead pipe and crack him over the head with it."

I am not unmindful of the revolting conduct charged against this defendant. If he is guilty, he should be punished. Nevertheless, every person accused of an offense is entitled to a fair and impartial trial, conducted impartially and without bias and prejudice. The language in Keefe v. State, *supra,* is appropriate here. In this Keefe case the defendant was charged with a sex offense against a four-year-old girl. We said [50 Ariz. 293, 72 Pac. (2d) 426]:

"The crime charged is of such a nature that every right-minded man or woman views it with horror and aversion, and especially when committed by an adult upon the person of a child. But for this very reason justice requires particular care that one charged with such a crime should not be convicted thereof on insufficient or improper evidence. A great judge once said in regard to rape, that such a charge was one 'easy to make, difficult to prove and more difficult to disprove, though the accused be never so innocent.' (1778) 1 Hale P. C. 635. Much more is this true of such a crime as the one charged herein. For this reason we must scrutinize most carefully the evidence on which the conviction in this case was based to see whether it was legally admissible to prove the ultimate fact in issue."

The most damaging testimony in this case, and which undoubtedly led to the conviction of the defendant, is contained in the testimony of the county attorney as set forth in the majority opinion. By

way of impeachment, the county attorney was permitted to testify as to what the defendant's mother had told him and the justice of the peace. The mother's opinion as to the guilt of her son was predicated upon what the little girl had told her and from her own examination. This statement was made by her at a time when the child was being examined by the doctor. The doctor testified that he could not tell from his examination whether the child had been violated the day before. Hearsay testimony is not legal testimony. If the mother had been called as a prosecuting witness, she could not have been legally permitted to relate what the child told her, nor could she have been legally permitted to state her opinion without showing her qualifications, and without testifying as to the facts upon which she based her opinion. Thus, under the guise of impeachment, the county attorney was permitted to testify and relate hearsay testimony four times removed; the child told her mother; the mother told the grandmother; the grandmother told the county attorney; the county attorney told the jury. The physical improbability of the act having occurred as the child testified is worthy of note. She testified that she sat on top of the lavatory and that the defendant stood up. Did she mean that she sat on the toilet seat or that she sat on top of the tank, which the evidence shows was approximately three feet off the ground and constituted a ledge approximately six inches deep and thirty inches wide? At the back of the six-inch depth there was the perpendicular wall of the room. As was said in the recent case of *People* v. *Auge,* (1945, Cal.), 159 Pac. (2d) 97, 101:

"... It was a close question as to whether the testimony of the prosecutrix should have been accepted or rejected. In *People* v. *Putnam, supra,* 20 Cal. (2d) 885, at page 891, 129 Pac. (2d) 367, at page 370, it was said: 'It has been long recognized that

there is no class of prosecutions "attended with so much danger, or which afford so ample an opportunity for the free play of malice and private vengeance." ' In a case of this kind, owing to the disadvantage in which a defendant is placed, it was stated in *People* v. *Baldwin*, 117 Cal. 244, at page 249, 49 Pac. 186, at page 187, that 'he should be given the full measure of every legal right in an endeavor to maintain his innocence.' "

The cold record here bristles with animosity, bias, and prejudice, upon which no restraints were imposed. The judgment should be reversed and the case remanded for a fair and impartial trial.